**JAMES MADISON LIMITED, by Norman F. HECHT, Sr., Assignee, Appellant**

v.

**Eugene A. LUDWIG, Comptroller of the Currency, et al., Appellees.**

No. 95–5126.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1995.

Decided May 3, 1996.

Suggestion for Rehearing In Banc Denied July 3, 1996.

As Amended on Denial of Rehearing July 3, 1996.

---

William J. Smith, Washington, DC, argued the cause and filed the briefs for appellant.

Ellen M. McElligott, Senior Trial Attorney, Office of the Comptroller of the Currency, with whom L. Robert Griffin, Director of the Litigation Division, was on the brief, argued the cause for appellee Comptroller of the Currency. Joan M. Bernott, Assistant Director of the Litigation Division, Washington, DC, entered an appearance.

Thomas L. Holzman, Counsel, Federal Deposit Insurance Corporation, with whom Thomas A. Schulz, Assistant General Counsel, Colleen J. Bombardier, Senior Counsel and Charles L. Cope, II, Senior Counsel, Washington, DC, were on the brief, argued the cause for appellee Federal Deposit Insurance Corporation.

Before: GINSBURG, ROGERS, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

After examining the financial condition of Madison National Bank and Madison National Bank of Virginia, the Comptroller of the Currency declared the banks insolvent and appointed the Federal Deposit Insurance Corporation receiver of the two institutions. The banks' holding company sued, charging that the federal agencies abused their discretion, acted arbitrarily and capriciously, and failed to follow statutorily prescribed procedures in taking over the banks. The holding company later sought leave to amend its original complaint to add counts alleging that the statute authorizing the government seizure of the banks and the seizure itself violated the Fifth Amendment's due process guarantee. The district court granted summary judgment for the Government on the claims in the original complaint and denied the motion to amend.

Rejecting the FDIC's argument that federal district courts lack jurisdiction to grant any of the relief the holding company seeks, we reach the merits of this appeal. Because we agree with the district court that the question of whether the Government acted arbitrarily in seizing the banks presents no genuine issues of material fact and that the Government is entitled to judgment as a matter of law, we affirm the district court's grant of summary judgment for the Government. And because the undisputed facts show that the banks received all the process they were due under the Fifth Amendment, we agree with the district court that amending the complaint would have been futile and so affirm its denial of the motion to amend.

## I.

The Office of the Comptroller of the Currency, a bureau of the United States Department of the Treasury, is headed by the Comptroller of the Currency and is the primary regulator of federally chartered commercial banks, known as national banks.

The OCC periodically examines national banks. *See* 12 U.S.C. § 481 (1994). Upon determining that a national bank is insolvent, the Comptroller may appoint either a conservator or a receiver of the institution. *Id.* § 191 (authorizing appointment of receiver); *id.* § 203 (authorizing appointment of conservator). If the Comptroller chooses to appoint a conservator of a national bank, the statute *allows* the appointment of the FDIC; but if the Comptroller appoints a receiver, the statute *requires* the appointment of the FDIC. 12 U.S.C. § 1821(c)(2)(A)(i)–(ii) (1994). The principal difference between a conservator and receiver is that a conservator may operate and dispose of a bank as a going concern, while a receiver has the power to liquidate and wind up the affairs of an institution. 12 U.S.C. § 1821(d)(2) (1994); H.R.CONF.REP. No. 209, 101st Cong., 1st Sess. 398 (1989).

In January 1991, the OCC conducted a limited review of Madison National Bank, Madison National Bank of Virginia, and United National Bank—three banks owned by James Madison Ltd., a bank holding company. The investigation focused on the banks' aggregate allowance for loan and lease losses, a reserve that banks maintain to absorb losses they are likely to incur because of an inability to recover the full value of the loans and leases on their books. *See* Interagency Policy Statement on the Allowance for Loan and Lease Losses, BB 93–60, 1993 WL 542562 (Dec. 21, 1993). This reserve may be critical to a bank's financial condition. Banks treat additions to their reserves as expenses, charging them first against current earnings; if earnings are inadequate to cover the cost of an addition to the reserve, the addition is charged against the bank's equity capital. Thus, a relatively large addition to the reserve might not only eliminate all of a bank's current earnings, but also deplete a bank's accumulated capital, rendering the institution insolvent.

At the conclusion of its January review, the OCC informed the Madison banks that it had found serious weaknesses in their methodology for establishing their loan loss allowance and that it would return to conduct a more detailed examination of the adequacy of

the banks' reserves. That second examination lasted from mid-February through the end of April, during which United National Bank, along with a state-chartered institution, Madison Bank of Maryland, merged into Madison National Bank, leaving James Madison Ltd. as the owner of two national banks: Madison National Bank and Madison National Bank of Virginia. Determining that the loan loss allowances for the two resulting banks were inadequate, the OCC directed the banks on May 1 to add approximately $31.6 million to their allowances, leaving the institutions insolvent with a combined net worth of minus $15.8 million. At the same time, the OCC gave the banks an opportunity to submit a capital plan showing how they would return to financial health by the end of the year. After rejecting the banks' subsequently filed capital plan and acting pursuant to 12 U.S.C. § 191, the Comptroller declared the banks insolvent and appointed the FDIC as receiver. The FDIC began immediately disposing of the banks' assets and liabilities.

Having filed for bankruptcy, James Madison, Ltd. sued the Comptroller, the OCC, and the FDIC in the United States District Court for the District of Columbia. Count I of Madison's complaint alleged that, by failing to follow the agency's own guidelines in conducting the examination, the OCC examiners abused their discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1994). Count II claimed that, because the examiners lacked a rational basis for requiring $31.6 million in additional reserves, they acted arbitrarily and capriciously also in violation of 5 U.S.C. § 706(2)(A). Counts III and IV alleged that, by failing to conduct a "due examination" of the affairs of the banks prior to appointing the receiver under 12 U.S.C. § 191, the Comptroller abused his discretion and failed to observe procedures required by law in violation of 5 U.S.C. § 706(2)(A) and (D). As a remedy, Madison sought an injunction removing the FDIC as receiver; returning bank assets that the FDIC still had in its possession, as well as the proceeds from the FDIC's prior sales of the banks' assets; restoring the banks' charters to allow them to resume business; and returning the banks' files.

The Government moved for dismissal or, alternatively, for summary judgment. While the agencies' motions were pending, Madison filed a motion for leave to amend its complaint to add several new claims, two of which are at issue in this appeal: count IX, alleging that 12 U.S.C. § 191 *on its face* violates the due process guarantee of the Fifth Amendment by allowing the government to seize national banks without an adequate hearing; and count X, making the same due process challenges *as applied* in this case. As the remedy for these two alleged due process violations, Madison sought declaratory relief and an injunction similar to the one it sought for counts I through IV, or alternatively, monetary damages.

Shortly after filing its complaint, Madison requested discovery. Without objection from Madison, the court granted the Government's motion to stay discovery pending the outcome of its dispositive motions. In support of its motion for summary judgment, the Government submitted a statement of undisputed material facts describing events leading up to the seizure and liquidation of the banks, as well as a voluminous administrative record containing contemporaneous reports by the examiners regarding their findings during the 1991 examinations. Madison failed to file a statement of controverted material facts as required by Local Rule 108(h), submitting instead a list of questions along with affidavits of former bank officers and consultants challenging the reserves that the government required the banks to establish. Together with the pleadings and legal memoranda, this was the record before the district court.

The district court granted summary judgment to the Government, ruling that the OCC acted in accordance with the requirements of the Administrative Procedure Act in requiring the banks to add $31.6 million to their loan loss allowances and in declaring the banks insolvent. The district court also denied Madison's motion to amend its complaint, concluding that the two due process claims were "futile." In response to Madison's motion for reconsideration, the district court stood by its rulings. Madison now

appeals the grant of summary judgment on counts I through IV and the denial of its motion to add counts IX and X, based not only on the merits of the district court's rulings, but also on the adequacy of the record before the district court.

## II.

 Before addressing the merits of Madison's appeal, we first consider the FDIC's argument that two provisions of federal law deprive United States district courts of jurisdiction to grant the declaratory and injunctive relief Madison seeks. Although the agency suggests, without explanation, that we need not reach its jurisdictional arguments until after we consider the merits of the case, we have an affirmative obligation "to consider whether the constitutional and statutory authority exist for us to hear each dispute." *Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C.Cir.1992). If, as the FDIC contends, federal courts cannot grant any of the relief sought by Madison, a decision of this court would be an advisory opinion barred by Article III of the Constitution. *See Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (For a plaintiff to have standing, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' ").

 Because Congress has not specifically defined the power of federal courts to review the appointment of the FDIC as receiver of a national bank, our jurisdictional task is not easy. In other situations, where Congress authorized appointment of the FDIC as conservator or receiver of troubled financial institutions, it specifically addressed federal court jurisdiction to review those appointments. For example, Congress specifically authorized federal courts to review the appointment of the FDIC as *conservator* of a national bank. 12 U.S.C. § 203(b)(1)–(2) (1994). It also authorized judicial review of the FDIC's appointment as conservator or receiver of federally chartered savings associations and state-chartered institutions. 12

U.S.C. § 1464(d)(2)(A)–(B) (1994) (savings associations); 12 U.S.C. § 1821(c)(1), (4), (7) (1994) (state-chartered institutions). By comparison, the statute authorizing the FDIC's appointment as receiver of a national bank does not include a companion provision regarding judicial review of that appointment. *See* 12 U.S.C. § 191 (1994). In the absence of such specific authorization, we do not presume, as the FDIC argues, that Congress intended to preclude judicial review. Rather, we assume just the opposite—that the Administrative Procedure Act authorizes federal district courts to review the appointment, *Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967), unless another statute specifically precludes review or the action is committed by law to agency discretion, 5 U.S.C. § 701(a) (1994). Because of this presumption favoring judicial review, we require " 'clear and convincing evidence' of a legislative intention" to bar such review. *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1450 (D.C.Cir.1994) (quoting *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 63–65, 113 S.Ct. 2485, 2499, 125 L.Ed.2d 38 (1993)).

The FDIC first argues that 12 U.S.C. § 1821(j) prevents courts from reviewing its appointment as receiver of a national bank. Congress enacted section 1821(j) as part of section 212 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which expanded the FDIC's powers as conservator or receiver of all FDIC-insured depository institutions, including national banks. Pub.L. No. 101–73, § 212(a), 103 Stat. 222–43; H.R. Conf. Rep. No. 209, 101st Cong., 1st Sess. 398–99 (1989). The new section 1821(j) stated that: "Except as provided in this section"—i.e., section 1821—"no court may take any action, except at the request of the Board of Directors [of the FDIC] to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver." 12 U.S.C. § 1821(j) (1994). According to the FDIC, because section 1821(j) prevents courts from "restrain[ing] or affect[ing] the exercise" of its power as conservator or receiver, district courts may neither remove the FDIC as receiver of Madison nor grant any of the

other declaratory and injunctive relief that Madison seeks.

■ Until now, this circuit has not considered whether section 1821(j) precludes federal courts from granting injunctive or declaratory relief *if the Comptroller improperly appointed the FDIC receiver of a national bank.* In our view, section 1821 does no such thing. Section 1821(j) states only that courts cannot "restrain or affect the exercise of powers or functions of the [FDIC] *as* a conservator or a receiver." *Id.* (emphasis added). It does not address federal court power to set aside an illegal appointment *of* a conservator or receiver. Congress knows the difference between judicial power to restrain an agency properly acting as a receiver and judicial power to remove an improperly appointed agency. For example, Congress distinguishes between courts' authority to "restrain or affect the exercise of powers or functions of a conservator or receiver" of a savings institution and their authority to "take any action for or toward the *removal* of any conservator or receiver" of such an institution. 12 U.S.C. § 1464(d)(2)(D) (1994) (emphasis added). We thus read section 1821(j) to prevent courts from interfering with the FDIC only when the agency acts within the scope of its authorized powers, not when the agency was improperly appointed in the first place. We have recognized this principle before, observing that "§ 1821(j) does indeed bar courts from restraining or affecting the exercise of powers or functions of the FDIC as a conservator or a receiver *unless it has acted or proposed to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions.*" *Freeman v. FDIC,* 56 F.3d 1394, 1398 (D.C.Cir. 1995) (quoting *National Trust for Historic Preservation v. FDIC,* 21 F.3d 469, 472 (D.C.Cir.) (Wald, J., concurring), *cert. denied,* — U.S. ——, 115 S.Ct. 683, 130 L.Ed.2d 615 (1994)) (emphasis added; internal quotations and ellipsis omitted).

■ The FDIC's expansive reading of section 1821(j)—interpreting "restrain" and "affect" to prevent courts from interceding when the FDIC is wrongfully appointed— would not only bar relief in this case, but also preclude court action when the FDIC is named either receiver *or* conservator of *any* FDIC-insured depository institution. This interpretation conflicts with two other provisions of FIRREA: 12 U.S.C. § 203(b)(1), explicitly authorizing federal district courts to remove the FDIC as *conservator* of a national bank if the court finds the appointment "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and 12 U.S.C. § 1464(d)(2)(B), authorizing federal courts to remove the FDIC as conservator or receiver of a federally chartered savings association. *See* Pub.L. No. 101–73, § 802, 103 Stat. 442 (conservatorships of national banks); Pub.L. No. 101–73, § 301, 103 Stat. 292 (originally codified at 12 U.S.C. § 1464(d)(2)(E)) (receiverships and conservatorships of savings associations). Were we to adopt the FDIC's view that section 1821(j) prohibits courts from removing an illegally-appointed FDIC, we could reconcile section 1821(j) with section 203(b)(1) and section 1464(d)(2)(B) only by treating them as special exceptions to the general rule set forth in section 1821(j). Yet we find nothing in the legislative history suggesting that Congress viewed either section 203(b)(1) or section 1464(d)(2)(B) as creating exceptions to section 1821(j). *See* H.R. CONF.REP. No. 209, 101st Cong., 1st Sess. 398–400, 405–410, 443 (1989); H.R. REP. No. 54, 101st Cong., 1st Sess., pt. 1 at 415–21, 463 (1989). In our view, the more natural reading of section 1821(j), the reading that comports with our obligation to interpret the statute's provisions in harmony with each other, *see Ralpho v. Bell,* 569 F.2d 607, 617 (D.C.Cir.1977), is this: section 1821(j) restricts judicial power over the actions of a *properly-appointed* FDIC, while sections 203(b)(1) and 1464(d)(2)(B) address a different matter—judicial power to remove an *improperly-appointed* FDIC.

■ We recognize that our interpretation of section 1821(j) could make it more difficult for the FDIC to fulfill one of the goals of FIRREA: "to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country." *Freeman,* 56 F.3d at 1398. Under our interpretation, failed national banks may, as Madison

does here, challenge the FDIC's appointment pursuant to the APA, which carries a six-year statute of limitations. *Impro Prods., Inc. v. Block,* 722 F.2d 845, 850 (D.C.Cir.1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 264 (1984) (interpreting 28 U.S.C. § 2401 to apply to claims brought under the APA). In other contexts, Congress requires seized institutions challenging an allegedly unlawful seizure to move swiftly. National banks, for example, have twenty days to challenge the appointment of the FDIC as conservator, and federally chartered savings associations and state-chartered institutions have thirty days to challenge the FDIC's appointment as conservator or receiver. 12 U.S.C. § 203(b)(1)–(2) (national bank challenge to FDIC as conservator); 12 U.S.C. § 1464(d)(2)(B) (savings association challenge to FDIC as conservator or receiver); 12 U.S.C. § 1821(c)(1)(4), (7) (state-chartered institution challenge to FDIC as conservator or receiver). Yet the six-year statute of limitations for national banks would not necessarily frustrate Congress's goal of winding up the affairs of troubled institutions expeditiously. Courts may still exercise their discretion to deny injunctions under the APA, *see Indiana & Michigan Elec. Co. v. Federal Power Comm'n,* 502 F.2d 336, 346 (1974), and the Government may invoke equitable defenses such as laches where banks delay challenging the Government's seizure, *see Abbott Labs.,* 387 U.S. at 155, 87 S.Ct. at 1519. Moreover, disposing of insolvent institutions quickly was not FIRREA's only purpose. Congress also sought to protect the rights of financial institutions by allowing them to appeal their seizures. Our interpretation of section 1821(j), unlike the FDIC's, would preserve that right for national banks placed in receivership.

■ The second provision that the FDIC cites in support of its jurisdictional argument—12 U.S.C. § 1821(d)(11), also originally enacted as part of section 212 of FIRREA—is one of several provisions defining the procedure that the FDIC must follow when, acting as receiver of a failed institution, it processes claims against the institution. *See* 12 U.S.C. § 1821(d)(3)–(13); *Freeman,* 56 F.3d at 1399. Section 1821(d)(11)

requires the FDIC to satisfy depositors, creditors, and other claimants, as well as to pay administrative expenses, before distributing any funds to the institution's stockholders. According to the FDIC, section 1821(d)(11) bars district courts from granting the relief Madison seeks because to do so would in effect place Madison and its stockholders at the head of the line to recover their assets. Instead, the FDIC argues, Madison must wait until the government liquidates the institution, satisfies all claimants, and pays all administrative expenses, at which point Madison can recover whatever is left.

This argument ignores the text of the statute. The distribution requirements of section 1821(d)(11) apply only to claims that the *FDIC* processes "as receiver," not to claims that *courts* adjudicate regarding the actual validity of the FDIC's appointment. *See* § 1821(d)(3)(A), (d)(11)(A). Moreover, requiring stockholders of wrongfully seized national banks to wait on the sidelines while the FDIC liquidates their institutions conflicts with Congress's apparent desire, discussed above, that seized institutions act quickly in challenging the FDIC's appointment. The FDIC fails to explain why Congress would have permitted rapid judicial review of the FDIC's appointment as conservator of national banks or as a conservator or receiver of other depository institutions, while preventing courts from reviewing the FDIC's appointment as receiver of national banks until *after* the agency dismantles the institution.

■ In the absence of a statute specifically providing for judicial review of the FDIC's appointment as receiver of national banks, and without clear evidence that Congress intended either section 1821(j) or section 1821(d)(11) to bar federal court jurisdiction, we hold that the APA authorizes federal courts to review and set aside improper appointments of the FDIC as receiver of national banks. *See FDIC v. Irwin,* 916 F.2d 1051, 1054 n. 4 (5th Cir.1990). Because the district court has jurisdiction to grant injunctive and declaratory relief, we need not reach the FDIC's additional argument that *FDIC*

*v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994), bars the district court from granting the monetary relief that Madison seeks as an alternative remedy. We therefore turn to the merits of Madison's claims.

## III.

Madison offers several reasons why the district court erred in granting summary judgment for the Government on Counts I through IV. We begin with its claim that the district court acted on an inadequate record. According to Madison, the court should have reviewed all of the banks' loan files, underwriting materials, and credit documents the examiners might have seen. These materials came into the Government's possession when it seized the banks. As with a district court's denial of discovery, we review a district court's refusal to supplement the administrative record for abuse of discretion and may reverse factual findings regarding the state of the administrative record only for clear error. *Fort Sumter Tours, Inc. v. Babbitt,* 66 F.3d 1324, 1335–36 (4th Cir.1995); *Occidental Petroleum Corp. v. SEC,* 873 F.2d 325, 339–40 (D.C.Cir.1989).

The APA requires courts to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Ordinarily, courts confine their review to the "administrative record." *Edison Elec. Inst. v. OSHA,* 849 F.2d 611, 617–18 (D.C.Cir.1988). The administrative record includes all materials "compiled" by the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), that were "before the agency at the time the decision was made," *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284 (D.C.Cir.1981).

Madison concedes that the banks' files were not part of the administrative record compiled by the agency when the Senior Deputy Comptroller declared the banks insolvent. Madison also fails to demonstrate the existence of any of the factors we have previously recognized as requiring district courts to supplement the administrative record. Madison does not contend that the agency deliberately or negligently excluded

documents that may have been adverse to its decision. *See Kent County v. EPA,* 963 F.2d 391, 395–96 (D.C.Cir.1992). Nor has Madison shown that the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors. *Environmental Defense Fund, Inc.,* 657 F.2d at 285 (citing *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980)). This is not a case where the agency failed " 'to explain administrative action [so] as to frustrate effective judicial review.' " *Id.* (quoting *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)). To the contrary, the record contains detailed contemporaneous reports from the examiner-in-charge and members of her examination team explaining how and why they reached their conclusions regarding the banks' reserves.

Madison claims that the agency acted in bad faith in declaring the banks insolvent. It relies on affidavits of two former officers and a consultant Madison had retained, who stated that "it appeared" from the examiners' hostile attitudes, their unwillingness to correct errors, and the "severity" of the required reserves, that the examiners were "expected," "instructed," or had a "predetermined agenda" to render the bank insolvent by requiring additional loan loss reserves. Unsupported by other evidence, these conclusory statements fall far short of the "strong showing" of bad faith required to justify supplementing the record. *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825.

Madison has demonstrated no other "unusual circumstances" requiring the district court to expand the record. *See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 698 (D.C.Cir.1991). Claiming that the examiners were the "real decision-makers," Madison argues that the district court should have reviewed whatever materials the examiners may have seen during their on-site investigation of the banks. In our view, the role of the examiners is irrelevant. Regardless of how much influence the examiners may have had in the decision to declare the banks insolvent, the administrative record included detailed memoranda describing the examiners' findings and recommenda-

tions, and Madison has given no reason why the district court should have looked beyond those memos.

In short, Madison fails to demonstrate that the record was in any respect inadequate as a basis for district court review of the Government's decisions. The district court thus did not err in limiting its review to the administrative record presented by the agency.

■■■ Madison makes a related claim that the district court erred in granting summary judgment without allowing it to conduct further discovery. Under Rule 56(f) of the Federal Rules of Civil Procedure, a district court may deny a motion for summary judgment in order to permit further discovery if "the party opposing the motion adequately explains why ... it cannot present by affidavit facts needed to defeat the motion." *Strang v. United States Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C.Cir. 1989). Madison concedes that it asked the district court to vacate its order staying discovery only if the court "considered the examples of wrongful and arbitrary action by the examiners relating to the ... loans discussed in [Madison's] affidavits to be insufficient as to the dollar amount of the loans affected." Appellant's Br. at 43. This conditional request did not amount to the adequate explanation that Rule 56(f) requires. At most, Madison invited the district court to expand its review beyond the administrative record if it found Madison's evidence insufficient. Such a request fell far short of offering specific reasons why, absent discovery, Madison was incapable of contesting summary judgment based on the administrative record and the recollections of the banks' loan officers and consultants. *See Strang*, 864 F.2d at 861. In declining to grant discovery, the district court thus did not abuse its discretion.

■■■ This brings us to Madison's challenges to the merits of the district court's summary judgment ruling. We may uphold the district court's grant of summary judgment only if, viewing the evidence in the light most favorable to Madison, we find no genuine issues of material fact and, absent such issues, we determine that the Government is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *In re Sealed Case*, 67 F.3d 965, 967 (D.C.Cir.1995). We conduct our review *de novo* without deference to the district court's determinations. *Dr. Pepper/Seven–Up Cos. v. Federal Trade Comm'n*, 991 F.2d 859, 862 (D.C.Cir.1993).

■■■ Madison claims that there are "issues of *fact* as to whether ... the examiners acted arbitrarily and capriciously in requiring ... such large additional loan loss reserves." Appellant's Brief at 44–45 (emphasis added). Although Madison characterizes its arguments as raising issues of fact, we think they primarily raise issues of law. Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions. *See Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1224 (D.C.Cir.1993); 6 J. Moore, Federal Practice ¶ 56.17[3], 56–362 (1988). Like appellate courts, district courts do not duplicate agency fact-finding efforts. Instead, they address a predominantly legal issue: Did the agency "articulate a rational connection between the facts found and the choice made"? *Bowman Transp., Inc. v. Arkansas–Best Freight Sys. Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974) (internal quotation marks omitted). District courts may, however, need to resolve factual issues regarding the process the agency used in reaching its decision. *See Occidental Petroleum Corp.*, 873 F.2d at 339–40. Although these facts are usually established by the administrative record or are otherwise undisputed, parties may occasionally raise an issue requiring district courts to engage in independent fact-finding. *See, e.g., Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825.

■■■ Viewed in this light, Madison sought to raise only one factual issue before the district court: it claimed that the examiners acted in bad faith. If true, this "fact" would be material to determining whether the Government acted arbitrarily in establishing the loan loss allowance. *See Latecoere Int'l, Inc. v. United States Dep't of the Navy*, 19 F.3d

1342, 1364–65 (11th Cir.1994). The affidavits that Madison submitted in opposition to the motion for summary judgment were, however, the only evidence of the Government's bad faith. Having reviewed these affidavits, we determined above that they failed to make the "strong showing" of bad faith to warrant their inclusion in an expanded administrative record. We therefore do not consider them now in determining whether Madison raised a genuine issue regarding the Government's motivation in declaring the banks insolvent. Thus finding no evidence that the Government acted in bad faith, we conclude that Madison has failed to raise a genuine issue of the Government's motivation.

■ Regarding Madison's legal arguments, our task is to determine whether the OCC acted reasonably in requiring the banks to establish reserves of such magnitude as to force them into insolvency. According to the Government's undisputed statement of facts, the examiners began the process of determining the level of required reserves by reviewing the ratings that the banks had assigned to approximately 50% of the loans in their portfolio. Under federal guidelines, loans are rated in descending scale of quality: pass; other assets especially mentioned (known as "special mention"); substandard; doubtful; and loss. After reviewing these ratings and downgrading many, the examiners calculated the reserves required for the portfolio. For loans rated doubtful and for some loans rated substandard, the examiners conducted a loan-by-loan analysis, requiring the banks to establish "specific reserve allocations" reflecting the likely losses on those individual assets. For the remainder of the loans, the examiners established a "general reserve allocation" by conducting what is known as a "migration analysis." This analysis determined the percentage of losses that the banks experienced during the preceding two years on loans rated pass, special mention, and substandard and, applying those historic loss rates to the loans *currently* rated pass, special mention, and substandard, projected the losses that the banks were likely to experience. By then adding the specific and general allocations, the examiners determined the overall amount that the banks had to add to their reserves.

Attacking the general reserve allocation, Madison claims that because Washington, D.C. suffered an "unprecedented" decline in real estate values during the 1989–1990 period covered by the migration analysis, the analysis projected artificially inflated losses. According to Madison, the migration analysis should have used three to five years of data to provide a more realistic projection of future losses. We are not persuaded. Although banks might usually use three to five years of data to forecast future losses, Madison itself acknowledges that much of *its* own historical data was flawed because it had an inadequate system for risk-rating its loans prior to the fourth quarter of 1989. We doubt that additional years of flawed data would have generated more accurate predictions. Moreover, the examiners' approach took into account the problems with the bank's data in a way that benefitted the banks: rather than mechanically applying the historic loss percentages to the banks' current portfolio, the examiners disregarded certain data from the first three quarters of 1989 that generated abnormally high levels of losses. Indeed, Madison's own affidavit shows that the reserves required by the Government's migration analysis—14 percent for substandard real estate loans and 23 percent for substandard commercial loans—were within the "usual and customary" range in the banking industry of 5 to 25 percent for such loans.

Focusing on three particular loans, Madison also argues that the specific reserve allocations were arbitrary and capricious. Based on our own review of the written summaries that the examiners prepared for each of these loans, we conclude that the examiners offered a reasoned explanation for the reserves they required.

As to the first loan, the examiners instructed Madison to establish a reserve of $1.75 million for a $4 million unsecured loan that was two months past due. Under a proposed restructuring of the loan, the borrower planned to provide a personal guaranty and a 743–acre farm, appraised at $11.9 million, as collateral to secure repayment. According to Madison, the examiners should have regarded the personal guaranty and the farm as

adequate collateral. To us, however, the examiners offered sensible reasons for discounting the value of both the guaranty and the farm. The guarantor's net worth consisted primarily of interests in real estate partnerships and closely held corporations that had lost millions of dollars in 1990 and were projected to do so again in 1991. Moreover, the guarantor's contingent liabilities exceeded his estimated net worth by a ratio of more than two-to-one. As for the farm, the examiner noted, and Madison does not disagree, that the appraisal assumed the land would be used for a residential development, requiring rezoning the property, which the county had been reluctant to do in other circumstances. Given the dubious prospects for repayment, the examiners provided a rational explanation for requiring a $1.75 million reserve for this loan.

We are equally unconvinced by Madison's objections to a $477,000 reserve that the OCC required for a $4.6 million loan secured by 75 acres of undeveloped residential land and 35 acres of developed commercial property. Although acknowledging that the value of the property appeared adequate to repay the loan, the examiners were concerned about the absence of a current appraisal. Lacking that information, the examiners based their reserve requirement on the uncontested facts that the borrower had lent $4.4 million to a joint venture to develop the residential property, that the joint venture had defaulted on that loan and was in serious financial difficulty, and that the borrower had indicated that he would have problems paying Madison if the joint venture failed to repay its loan. In light of these circumstances, we cannot say that the OCC acted irrationally in requiring a reserve of approximately 10 percent.

Madison's third objection is to a $2.3 million reserve that the examiners required for a $5.7 million loan to three real estate partnerships. As collateral, the borrowers had provided a $1 million certificate of deposit, a $625,000 third party note, and an unrecorded second mortgage on two office buildings. The loan was due in full in several months. While giving credit to the certificate of deposit and the note, the examiners concluded

that refinancing the two buildings would provide only $500,000 toward the repayment of the loan. They based their finding on Madison's own analysis, which indicated that the borrowers could obtain a new mortgage loan on the buildings for $20.5 million. After paying off the $20 million first mortgage held by another institution, this left $500,000 for the Madison loan. Since the borrowers had only this $500,000, the certificate of deposit, and the note to pay off a $5.7 million loan, we think the requirement of a $2.3 million reserve was reasonable.

Madison has thus failed to demonstrate that the examiners acted irrationally in establishing either the general or specific reserve allocations. This failure also dooms Madison's final argument: that the district court erred by focusing on the reasonableness of the OCC's *procedures* rather than on the *substance* of its decision to require $31.6 million in additional reserves. We agree that judicial review of agency action under the APA must go beyond the agency's procedures to include the substantive reasonableness of its decision. *See Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823 (stating that section 706 "require[s] the reviewing court to engage in a substantial inquiry"). Although the reasonableness of the agency's procedures is relevant to the court's inquiry, reasonable procedures alone cannot absolve a court from making a "thorough, probing, in-depth review" to determine if the agency has considered the relevant factors or committed a clear error of judgment. *Id.* at 415–16, 91 S.Ct. at 823–24. For example, examiners could follow all the prescribed steps for estimating loan loss reserve requirements—reviewing loan files, assigning risk ratings to the loans, using historical experience to determine the future losses on those loans—and still violate the APA by ignoring salient facts in the loan files, offering patently implausible justifications for their decisions, or acting from a personal desire to shut down the bank regardless of what they found.

Even if the district court here based its decision on the strength of the process alone—which we do not believe is the case—our *de novo* review of the record satisfies us that the agency's conclusions were not arbi-

trary. As we indicate above, the record shows that the agency exercised reasoned judgment in requiring the banks to add $31.6 million to cover potential credit losses in their portfolios.

## IV.

■ We turn finally to the district court's denial of Madison's request to amend its complaint to add counts IX and X challenging 12 U.S.C. § 191 on due process grounds. At the time the Government seized the banks, section 191 provided that "whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs . . . appoint a receiver, who shall proceed to close up such association." 12 U.S.C. § 191 (1988).

■ We review a district court's denial of a motion for leave to amend a complaint for abuse of discretion, *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1279 (D.C.Cir.1994), requiring only that the court base its ruling on a valid ground, *National Treasury Employees Union v. Helfer,* 53 F.3d 1289, 1295 (D.C.Cir.1995). Courts may deny a motion to amend a complaint as futile, as the district court did here, if the proposed claim would not survive a motion to dismiss. *Foman v. Davis,* 371 U.S. 178, 181–82, 83 S.Ct. 227, 229–30, 9 L.Ed.2d 222 (1962); *Moldea v. New York Times,* 22 F.3d 310, 319 (D.C.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 202, 130 L.Ed.2d 133 (1994). Because both the facts alleged in Madison's own complaint and the Government's statement of undisputed facts establish beyond doubt that the Government did not violate Madison's due process rights, we agree with the district court that amendment was futile.

■ Although the precise requirements of due process depend upon the circumstances, *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), the fundamentals remain constant: to deprive an individual of a protected interest, the government must provide adequate notice and a "meaningful" opportunity to be heard, *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901–02, 47 L.Ed.2d 18 (1976). Except in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event," the government must provide the hearing before the deprivation

takes place. *United States v. James Daniel Good Real Property,* 510 U.S. 43, ——, 114 S.Ct. 492, 501, 126 L.Ed.2d 490 (1993) (internal quotations omitted).

■ Madison does not object to the notice it received under section 191, and for good reason. The OCC gave ample warning of its concerns about the adequacy of the banks' reserves and the possibility of a government seizure. For at least three years prior to the examination leading to the takeover, the OCC repeatedly expressed its concern about the inadequacy of Madison's methodology for calculating its loan loss allowances. In January 1991, the Government informed Madison of its dissatisfaction with the banks' reserve methodology and its intention to make the reserves the focus of a special examination. The banks were clearly on notice that they might be declared insolvent.

Madison argues that, because of the timing of the district court proceeding, it had no meaningful opportunity to be heard. It claims that it was entitled to an administrative hearing by an impartial officer prior to the Government's seizure of the banks or, at the very least, prior to the FDIC's liquidation of its banks. Although Madison was clearly entitled to a hearing before a neutral decision-maker, *see University of the Dist. of Columbia Chairs Chapter, American Ass'n of Univ. Professors v. Board of Trustees of the Univ. of the Dist. of Columbia,* 56 F.3d 1469, 1473 (D.C.Cir.1995), we do not agree that due process requires a hearing prior to the disposal of its assets.

■ To determine whether due process demands a pre-deprivation hearing, we consider three factors: "the Government's interest," "the private interest affected by the official action," and "the risk of erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards" provided by a pre-deprivation hearing. *James Daniel Good,* 510 U.S. at ——, 114 S.Ct. at 501. As to the first of these factors, the Government has a substantial interest in moving quickly to seize insolvent institutions. We have previously recognized that requiring a *pre-seizure*

hearing could expose both depositors and the FDIC insurance fund to further losses from the continued operation of a failed institution by its management. *Haralson v. Federal Home Loan Bank Bd.,* 837 F.2d 1123, 1127 (D.C.Cir.1988). Equally strong is the Government's interest in swiftly disposing of assets and liabilities after a seizure takes place in order to ensure the smooth transfer of a bank's deposits and branches to other institutions, as well as to minimize losses for both depositors and taxpayers that could occur if the Government had to hold on to a bank's assets when the value of those assets is declining. *Cf.* 58 Fed.Reg. 6,363, 6,365 (1993) (noting that the value of an institution's deposits depends in part upon the stability of those deposits); 57 Fed.Reg. 11,005, 11,006 (1992) (same). In other contexts, the Supreme Court has found the government's interest in protecting depositors and preserving the integrity of the banking industry sufficiently strong to justify seizing a bank, suspending a bank's officers, and attaching liens against the property of a bank's stockholders without a prior hearing. *Fahey v. Mallonee,* 332 U.S. 245, 253–54, 67 S.Ct. 1552, 1554–56, 91 L.Ed. 2030 (1947) (upholding appointment of conservator of a bank during an investigation into unsound banking practices, with administrative hearing provided after the seizure); *FDIC v. Mallen,* 486 U.S. 230, 241–42, 108 S.Ct. 1780, 1788–89, 100 L.Ed.2d 265 (1988) (upholding suspension of indicted bank officer where the government would grant an administrative hearing within 30 days of a request to do so); *Coffin Bros. v. Bennett,* 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768 (1928) (upholding the government's power to place a lien on the property of a bank's stockholders to pay depositors of a failed bank, where a post-attachment trial would serve as the hearing). The Government's interests here are no less compelling.

The private interests at stake—the second of the three factors we weigh—are less compelling than the Government's interest. To be sure, Madison's stockholders have a valid interest in avoiding the arbitrary seizure of their business, even if that seizure lasts only for a limited time. *See Connecticut v. Doehr,* 501 U.S. 1, 11–13, 111 S.Ct. 2105, 2113, 115 L.Ed.2d 1 (1991). As entities subject to constant and intensive government regulation, however, the banks' interest is not as strong as the public's interest in protecting the stability and integrity of the banking system. Nor is the banks' interest as compelling as an individual's interest in avoiding "governmental interference" with homes or furniture, which the Supreme Court has recognized as requiring a pre-deprivation hearing. *James Daniel Good,* 510 U.S. at ——, 114 S.Ct. at 501 (discussing *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991)); *see also Woods v. Federal Home Loan Bank Bd.,* 826 F.2d 1400, 1411 (5th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988).

As for the last of the three factors—the risk of error—the OCC's examination process included numerous safeguards against an arbitrary seizure of the banks. From the very beginning, Madison had many opportunities to express its views. Through memoranda and meetings, loan officers and senior management had the chance to respond to the risk ratings that the examiners proposed to assign to the banks' loans. Madison's Audit Committee met with the examiner-in-charge to discuss the migration analysis and her preliminary reserve recommendations, even providing the OCC with a written critique of the migration analysis. To present their concerns about the examination, the banks' managers met repeatedly with members of the examination team, as well as with the Deputy Comptroller for Special Supervision and the Senior Deputy Comptroller for Bank Supervision Operations. The banks' independent auditors and outside consultants also met with the examiners and OCC officials. On May 1, the boards and senior management of the banks met with officials from the OCC, the FDIC, and the Federal Reserve Board to discuss the results of the examination; at that time, the OCC also gave the banks an opportunity to submit a capital plan to avoid closure. The OCC itself subjected the examiners' findings to internal review. Along with the oversight provided by senior officials, agency staff not involved in the Madison examination conducted independent "peer" reviews of the examiners'

risk ratings and their migration analysis. Although a formal pre-deprivation hearing might have reduced the risk of error, that risk was already substantially limited by the examination process itself.

■ In light of the Government's need to act swiftly, the limited nature of Madison's interest, and the procedures in place to minimize the risk of an erroneous decision, we find no due process defect in the timing of Madison's hearing. Nor do we agree with Madison's alternative argument that the district court violated the Fifth Amendment by denying discovery or refusing to expand the record to include the banks' loan files and other underwriting documents. As noted above, if Madison had presented the court with a sufficient reason to conduct discovery or expand the record, the court could have done so. Madison therefore had a meaningful opportunity to challenge the Government's actions. Due process requires no more.

In view of our finding that the judicial proceedings here and in district court satisfied the hearing requirements of the Fifth Amendment, we agree with the district court that amending the complaint to add Madison's as-applied due process challenge in Count X would have been futile. Since the requirements of due process have been satisfied in this instance, we agree with the district court that Madison's facial challenge in Count IX would have been futile as well. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (stating that a federal court generally can invalidate a statute on its face only if "no set of circumstances exists under which the [a]ct would be valid").

### V.

Because Madison has not demonstrated that the federal government acted arbitrarily or failed to abide by the requirements of the Fifth Amendment in seizing the banks, we affirm the district court in all respects.

*So ordered.*

### ORDER

July 3, 1996

PER CURIAM.

On consideration of the appellant's motion for rehearing and appellee FDIC's motion for clarification, it is

ORDERED by the court that the petition for rehearing be denied. It is

FURTHER ORDERED that the motion for clarification be denied. The court's slip opinion filed in this case on May 3, 1996 (reported at 82 F.3d 1085) does not address whether 12 U.S.C. § 1821(j) precludes district courts from enjoining the FDIC from disposing of the assets of a national bank, which has been placed in an FDIC receivership, while a challenge to the FDIC's appointment is pending. It is

FURTHER ORDERED that the opinion filed herein be amended as follows:

[Editor's Note: Amendments incorporated for purpose of publication.]