In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3194

CARPET SERVICE INTERNATIONAL,
INC., et al.,

*Plaintiffs-Appellants,*

*v.*

CHICAGO REGIONAL COUNCIL OF
CARPENTERS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 1083—**Geraldine Soat Brown,** *Magistrate Judge.*

ARGUED MARCH 26, 2012—DECIDED SEPTEMBER 25, 2012

Before EASTERBROOK, *Chief Judge*, and BAUER and
WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-appellant, Carpet
Service International, Inc. ("CSI") (primary employer),
brought an action for damages against defendants-appel-
lees, Chicago Regional Council of Carpenters ("Regional
Council") and United Brotherhood of Carpenters and

Joiners of America Local No. 13 ("Local 13"), for unfair labor practices under the Labor Management Relations Act ("LMRA") as codified in 29 U.S.C. § 187. Plaintiff-appellant, Carmine Molfese ("Molfese"), brought individual state law claims of assault and battery and intentional infliction of emotional distress ("IIED") against Patrick Ryan, a union organizer for Local 13. A bench trial was conducted and the district court ruled in favor of defendants Regional Council, Local 13, and Patrick Ryan on all counts. CSI appealed; we affirm.

## I. BACKGROUND

As the district court stated in its memorandum opinion and order ("opinion"), the facts of this case are particularly difficult to discern; deposition and trial testimony was muddled, inconsistent, and contradictory. The district court noted that one possible reason for the extensive confusion might have been that the labor dispute at issue was one of three similar disputes involving some of the same individuals, companies, and union organizations occurring about the same time. The district court also stated that certain unfavorable trial practices, such as leading witnesses on direct examination, "significantly undermined" the credibility and reliability of plaintiffs' witnesses. Nevertheless, in its opinion the district court made a thorough analysis of all testimony and evidence presented at trial. The court then explained its own determinations of credibility and reliability.

Because the issues before this Court were adjudicated pursuant to a full bench trial, we review the district court's

conclusions of law *de novo* and its findings of fact for clear error. *Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000). "If the [district court] correctly states the law, then [its] findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous." *Id*. at 729 (quoting *Daniels v. Essex Group*, Inc., 937 F.2d 1264, 1269-70 (7th Cir. 1991)). "One of the basic tenets of appellate review of district court fact-finding is that where there are two permissible views of evidence, the factfinder's choice between them cannot be clearly erroneous." *Nemmers v. United States*, 870 F.2d 426, 429 (7th Cir. 1989) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)) (further citation omitted). As long as the district court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it even if convinced we would have weighed the evidence differently. *Id*.

Upon review of the record, we find the district court's factual findings to be without clear error. Below are the relevant credible facts as determined by the district court.

### A. The Parties

In September 2007, CSI entered into a contract with Sunrise Construction Group, Inc. ("Sunrise") (neutral employer) to install carpets, countertops, flooring, and wall tiles at a new condominium located at 24 South Morgan Street in Chicago, Illinois ("the job site"). The job site was located within the geographical jurisdiction of Local 13. Though CSI was not a signatory to a

collective bargaining agreement with Local 13 at the time, it did have four installers working at the job site; Pietro Molfese, the cousin of CSI's president, also served as CSI's onsite group leader. Aside from CSI, most workers at the job site were union members. The general contractor at the job site was a company called Karpediem (secondary employer), which employed Ross Ferraro as site manager and Robert Cruz as superintendent.

Michael Sexton served as president and business manager of Local 13 and was in charge of Local 13's operations. Michael's son, Ed Sexton, served as business representative for Local 13. Defendant-appellee Patrick Ryan served as a union organizer for Local 13.

### B. Facts Relating to the 29 U.S.C. § 187 Claims

In July 2008, Ryan went to the job site for a routine check-up on some of the Local 13 union members. At this time, he met some of CSI's workers and became aware that Sunrise had contracted with CSI and was using their non-unionized workers on the job site. Ryan immediately announced to the site superintendent, Cruz, that he planned to picket and strike CSI's presence at the job site. In light of this, Cruz asked the CSI workers to leave for the day. Ryan submitted a written statement to the Regional Council requesting to picket the presence of CSI at the job site. On Saturday, July 26, 2008, the picketing began and was led by Ryan. Instead of holding signs, Local 13 wore reversible vests. One side of the vest bore the word "observer"; the other side read, "Chicago

Regional Council of Carpenters Local No. 13 ON STRIKE Against CSI for a Contract." Later, a picketer recalled picketing on August 19 and testified that he was told to wear the "observer" side, but only until CSI workers showed up, at which point he and the other picketers were to switch their vests to the "on strike" side. Most of the picketers were retired carpenters and teamsters paid to picket by the Regional Council; Ryan was responsible for approving their compensation.

On July 28, Ryan and Michael Sexton, met with Ferraro at the job site. Ryan asked why CSI was working at the job site and whether Ferraro knew that they were not unionized. Ryan and Sexton told Ferraro to "get rid of them," referring to CSI, and that if Ferraro used CSI on other job sites in the future, Local 13 would set up pickets at those jobs as well. (It is worth noting that Ferraro would later testify that he responded to the threats by telling Ryan and Sexton that CSI was a signatory to a union contract with Local 831. Ryan disputed ever knowing about any contract with Local 831 until sometime in August.)

Prior to July 28, CSI had entered into another contract to provide tiling services to a parking garage in Chicago called Monsoon Plaza. Due to Ryan's threat of future picketing, Ferraro canceled the contract and hired another company instead.

Though Ferraro did not fire CSI from the job site, he did move the CSI workers to night hours starting the following day. According to Ferraro, the picketing had caused progress at the job site to slow and he did not

want to lose any more time. Ferraro also hoped that having CSI work night hours would make the picketers go away.

In his complaint, Molfese, CSI's president, estimated that CSI lost profits of approximately $4000 when the Monsoon Plaza contract was cancelled.

### C. Facts Relating to the Assault and Battery and IIED Claims

In ruling on Molfese's claims of assault and battery and IIED, the district court stated that it carefully considered the testimony of each witness, including their reliability and credibility, their observational abilities, and whether or not they had any particular bias or interest in the outcome. The district court concluded that Molfese had failed to meet his burden to prove assault and battery and IIED. Nevertheless, we briefly recount the description of the altercation according to Molfese in order to illustrate the bases of his claim.

Molfese testified: he arrived at the job site at 10:00 a.m., he had the Local 831 contract in his pocket, and he walked toward Ryan and Ed Sexton who were standing outside of the building. He attempted to show them the contract, but they refused and angrily told him they would not honor it. He went back to his car and placed the contract on the passenger seat facing up and locked the door. As he walked back toward the building he saw Ryan approach the car and try to open the door to get the contract. Molfese went back, unlocked the car

door, and turned the contract upside down. Molfese claims that Ryan then said, "[w]ho are these [expletive racial slur] trying to be able to take our work away from this area?" Molfese then claimed Ryan hit him and kneed him right underneath his ribs. It is undisputed that several months prior in December 2007, Molfese had suffered a heart attack and undergone open-heart surgery. When he asked Ryan why he hit and kneed him, Molfese claims Ryan responded, "I'm going to give you another [expletive] heart attack." According to Molfese, Ed Sexton then pulled Ryan off of Molfese and called the police.

Molfese claimed this blow from Ryan caused him great pain and suffering due to the fact that he was still recovering from his open-heart surgery. On August 21, Molfese went to an urgent care facility after discovering blood in his stool and urine; he was examined and released. On August 26, Molfese saw his own doctor, Dr. Maida. Molfese testified that at that time he was fearful of having another heart attack, either caused by Ryan or otherwise. Ultimately, Molfese claimed that as a result of being hit by Ryan, he had suffered physical and emotional problems, including fatigue, back pain, shortness of breath, tenderness in his chest, nervousness, stress, ulcers, weight gain, and impotence.

Molfese sought $150,000 in compensatory damages and $1.5 million in punitive damages for his assault and battery and IIED claims. Additionally, because of Molfese's claimed medical conditions, his work suffered and he was forced to drastically cut back on his hours.

In light of this, CSI sought to recover $10,800 in damages for wages paid to Molfese for "non-productive time," and $100,000 in lost profits for the months of August to December 2008 due to Molfese's limited work product and inability to obtain bids.

At the conclusion of the bench trial, the district court determined neither CSI nor Molfese had satisfied their burden against the defendants.


## II. ANALYSIS

### A. CSI's Claims on Appeal

CSI claims the district court erred by failing to find that Regional Council and Local 13 violated 29 U.S.C. § 158(b)(4)(ii) by engaging in illegal secondary activity.

Title 29 U.S.C. § 158(b)(4)(ii) states: "[i]t shall be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person . . . to cease doing business with any other person . . . *Provided,* That nothing contained in this clause [ ] shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U.S.C. § 158(b)(4)(ii). A union does have the right to pressure a primary employer with which it has a grievance, utilizing strike or picketing methods, so long as the union does not directly involve or engage any secondary employer in the labor dispute. *BE&K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council,* 156 F.3d 756, 761 (7th Cir. 1998).

In cases such as this, where the primary employer and the secondary employer share a common work site, there is potential ambiguity as to which employer is being targeted. In such situations "the picketing is presumed lawful so long as the union does not intend to enmesh the secondary employer in the dispute." *Tri-Gen Inc. v. Intl. Union of Operating Engr's, Local 150, AFL-CIO*, 433 F.3d 1024, 1038 (7th Cir. 2006) (internal quotations omitted). With that said, even if picketing the primary employer has an incidental but foreseeable substantial effect on the secondary employer, the union remains within its rights so long as the purpose of the activity was not to coerce secondary employers. *Mautz & Oren, Inc., v. Teamsters, Chauffeurs, & Helpers Union, Local No. 279*, 882 F.2d 1117, 1121 (7th Cir. 1989). Naturally, "[p]rimary picketing always has as one of its goals the inducement of secondary employers to stop dealing with the primary employer," *Tri-Gen*, 433 F.3d at 1041; thus the plaintiff must bear the burden to prove that the union intended to pressure the secondary employer and that the union engaged in illegal conduct to that end. *BE&K*, 156 F.3d at 767.

To determine whether or not a union's activity was lawful when a primary and secondary employer are occupying the same work site, a court must employ the *Moore Dry Dock* standards. *Id*. at 761; see also *In re Sailors' Union of the Pacific AFL & Moore Dry Dock Co.*, 92 N.L.R.B. 547, 549 (1950). In order for the union activity to be considered lawful primary activity, (1) it must be strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

(2) the primary employer must be engaged in its normal business at the situs; (3) the activity must be limited to places reasonably close to the location of the situs; and (4) the activity must clearly disclose that the dispute is with the primary employer. *Id*.

On appeal, CSI argues that the district court failed to properly apply the *Moore Dry Dock* standards to Local 13's picketing activities. Additionally, CSI argues that the district court should have applied the standards to the threats made by Ryan to Ferraro. We disagree on both counts. The district court stated:

> The evidence at trial established that Local 13 substantially adhered to the *Moore Dry Dock* standards by limiting "on strike" picketing to [the job site] and [to] dates it could reasonably believe that CSI was working there, and by clearly identifying on the picketers' vests that the picket was against CSI. Therefore, Local 13's picketing is presumed lawful primary picketing.

The court properly applied the *Moore Dry Dock* standards. As noted at the outset, the purpose of appellate review is to determine whether or not the district court applied the proper law to the facts; determining reliability and credibility of evidence on the record is not part of this Court's undertaking. The district court's findings clearly show that Local 13's activities were lawful under the *Moore Dry Dock* standards.

With regard to the threats made by Ryan to Ferraro, though the district court determined that Ferraro's account was credible and reliable, application of the

*Moore Dry Dock* standards to Ryan's threats would require that the district court find the threats constituted secondary activity on the part of the union. The district court was correct to not make that determination.

The threats made by Ryan are not of the kind that were intended to be prohibited. Ryan simply attempted to persuade Ferraro by stating what Local 13's future course of action would be if Karpediem continued to employ non-union members. The threatened course of action is not in itself an illegal activity, nor is it improper for a union official to inform a secondary employer that they intend to picket the hiring of non-union members; picketing is an activity that unions are legally entitled to utilize and rely on. Ryan stating his intent to picket does not constitute secondary activity. The district court's determination to exclude Ryan's threats from the *Moor Dry Dock* analysis was proper.

### B. Damages

As previously stated, CSI claimed over $100,000 in damages as a result of Local 13's alleged violations. However, the district court determined that CSI failed to present the court with anything other than inconsistent estimates as to the amount it claimed; the court found CSI's claims to be too speculative. The damages consideration is irrelevant though, because we affirm the district court's final determination that neither Regional Council nor Local 13 acted unlawfully. CSI is therefore not entitled to any damages. See *Teamsters Local 20 v. Morton*, 377 U.S. 252, 260 (1964).

### C. Molfese's Claims

Finally, Molfese also appeals the district court's final determinations relating to his claims of assault and battery and IIED. The district court found Molfese's claims not to be credible because his supporting testimony was unreliable and inconsistent. These were fact-based determinations made by the district court. Having found no clear error, the issue is not eligible for review by this court.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.